Patrick H. Dwyer, SBN 137743
P.O. Box 1705
Penn Valley, CA 95946
Tel: (530) 432-5407; Fax: (530) 432-9122
Email: pdwyer@pdwyerlaw.com
Attorney for Plaintiff John David Peterson

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John David Peterson, an individual,<br><br>Plaintiff<br><br>v.<br><br>Nevada County, California, et al.,<br><br>Defendants. | CASE NO.: 2:19-CV-00949-JAM-EFB<br><br>**PLAINTIFF'S DISCLOSURE OF REBUTTAL EXPERTS UNDER FRCP 26(a)(2)(D)** |

Pursuant to FRCP 26(a)(2)(D) and the Court's Pretrial Scheduling Order (ECF 48), Plaintiff hereby discloses his rebuttal expert witnesses and accompanying reports.

I.  **Retained Rebuttal Experts**

    1.  **Plaintiff's Medical Expert**

Plaintiff's rebuttal expert witness for medical issues will be Dr. David J. Witt.  A copy of Dr. Witts rebuttal expert report is attached as Exhibit A.  Dr. Witt's CV, Fee Schedule, and list of trial and deposition testimony has not changed since his original disclosure as Plaintiff's expert witness.

Dr. Witt's further deposition may be arranged through Plaintiff's counsel.

II.     **Non-Retained Rebuttal Experts**

None.

Date: June 1, 2022                               Respectfully,


                                                 By: /s/ Patrick H. Dwyer
                                                 Counsel for Plaintiff John D. Peterson

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

**Supplemental report of David J. Witt, MD, FIDSA, CIC to original report of April 28, 2022**

*Matter of John David Peterson*

This report is in response to the deposition of Kim Ehrlich, MD and to clarify questions directed to me by Mr. Varanini during my deposition of May 24, 2022.

**I.      Response to** declaration **of Dr. Kim Ehrlich: Etiology of Mr. Peterson's Infection**

      **A.      Dr. Ehrlich's assessment of the Jail Medical Records**

Dr. Ehrlich does not seem to have examined the records from the jail.

      **B.      Dr. Ehrlich's assessment of the Dr. Berry's Surgical Notes and Deposition**

      Dr. Ehrlich appears to be basing his conclusion on the origin of the infection on the surgical findings solely. He quotes Dr. Micah Berry's operative note, "the infection was contiguous with his implant", however the suspected source of the infection, including potential origin from the implant versus other origins was not addressed by Dr. Berry. Indeed Dr. Berry himself, in the deposition related to this case, stated (Deposition of Micah D. Berry, M.D. December 5, 2019 2:19-cv-00949-JAMEFB P27:23 to 28:15) in response to "And with regard to this infected hardware are you able to ascertain the source of the infection? Did it start in the hardware on the bone or did it start somewhere else and get into the bone?" He answered, "I understand the question. But realistically it is impossible to give you a definitive answer".

      **C.      Dr. Ehrlich's assessment of the Other Clinical Indicators Of Infection Source**

      Nowhere in Dr. Ehrlich's declaration does he address the following findings which might indicate an acute source of the infection:
- acute development of pain in the ankle;
- the rapid progression of this process over a 48-hour period;
- the clear development of an extensive abscess during this time;
- normal white blood count at the time of Peterson's clearance exam for the jail and the elevation of the white count 48 hours after Peterson's admission to the jail and the resolution of the elevated white blood cell count after drainage

  of the abscess. (Sierra Nevada Memorial Hospital record pages 4, 5, 14, 15, 26, 143, 222);
- lack of evidence supporting a chronic infection or the uncanny chronologic relationship of the development of the abscess to Mr. Peterson's injury.

  This evidence supporting an acute process would also include:
- the long-term interval of minimal or no symptoms;
- the failure after admission to Sierra Nevada Memorial Hospital to identify any area of suspicious bone anomaly, including on plain x-rays of the tibia/fibula;
- the absence of findings of potential osteomyelitis on MRI scan and the complete absence of abnormality of white blood cell scan subsequent to removal of his hardware.

### D.     Dr. Ehrlich's assessment of the Rapid Speed Of Progression

Dr. Ehrlich also describes not believing that an infection could progress this quickly. Clearly Staphylococcus aureus can be indolent as Dr. Ehrlich suggests, or extremely aggressive as all infectious clinicians have seen.
Sarani B, Strong M, Pascual J, Schwab CW. Necrotizing fasciitis: current concepts and review of the literature. *J Am Coll Surg*. 2009;208(2):279-288. doi:10.1016/j.jamcollsurg.2008.10.032

V Ki, C Rotstein. Bacterial skin and soft tissue infections in adults: A review of their epidemiology, pathogenesis, diagnosis, treatment and site of care. Can J Infect Dis Med Microbiol 2008;19(2):173-184.


### II.     Response to Mr. Varanini's questions at my deposition of May 24th 2022.

Mr. Varanini asked me multiple questions regarding procedures and policies for discharge of a patient the Nevada County jail. I indicated I was not familiar with such a procedure and did not recall information related to this procedure during my review of the documents I was provided, including depositions by Ms. Tirpack and Ms. Adams. When consulted for this case, I was asked to opine on the nature, progression and consequences of Mr. Peterson's infection. Although procedures for discharge from jail are mentioned in documents I have reviewed for this case, it was not the focus of my review, nor, in retrospect are they clear from these depositions or documents. At the time of my deposition, I did not recall any specific mention of practices and protocols for this.

A.      **Medical Ethics and Professional Requirements: Patient Dumping**

As I stated in my testimony, licensed medical personnel caring for a patient have an ethical and, I believe, a legal obligation to ensure care that is necessary is continued in a secure manner. Failure of this may be commonly noted in the legal field as "abandonment" or in the medical field or journalistic field for a hospital, as "patient dumping".

As discussed by the National Commission on Correctional Healthcare, the following addresses this issue:

> "It is essential that clear communication flows between the sending and receiving facilities. That communication should include information about current treatments, medications, scheduled appointments and diagnostic studies. The information to be shared should give the receiving facility a clear picture of the current treatment needs of the arriving patient…….. The correctional nurse should be aware of the communication processes in the facility, including how to contact providers, make appropriate referrals, document care ordered, and care provided, as well as the patient's response, so that other members of the health care team are aware and can provide subsequent care per the treatment plan and patient need."

National Commission on Correctional Healthcare https://www.ncchc.org/cnp-continuity (accessed May 29, 2022)

Ensuring the appropriate transfer of caare has also been identified as a fundamental constitutional right. See Paul S. Appelbaum, M.D. Law & Psychiatry. Discharge Planning in Correctional Facilities: A Constitutional Right?
Published Online:1 Apr 2020https://doi.org/10.1176/appi.ps.202000084

B.      **Adams and Tirpak Testified Wellpath Had Authority to Hold release and Require Transfer to ER or Other Medical Care**

Reviewing Laurie Adams's deposition reveals that Wellpath jail medical personnel had the authority for deciding on medical care at the Wayne Brown Correctional Facility (WBCF) and the authority to place a hold on release and to require the transfer of Mr. Peterson to a local ER, or other medical provider, for treatment of his cellulitis.  (Deposition of Laurie Adams, Vol. 2, p. 38:18 to 40:4, 72:19 to 79:4). Ms.

Adams also clarified the discharge process. (p 17:20 to 18:10) as well to include the discharging deputy verifying with medical personnel that there was no hold on the release of the inmate due to medical reasons.

In reviewing both parts of Amanda Tirpack's deposition, she had no recall of specific procedures for discharge of an inmate in regards to medical needs. The only reference to an action for a medical need is that direction of medical care and need for additional or higher level of care would be in her discretion. Other than that, Ms. Tirpack voiced no recall of procedures or her actions in this case (Deposition of Amanda Tirpak, July 6, 2021, p. 57:17 to 59:25)

    C.    **Prior Practice of Nevada County Jail**

Mr. Dwyer forwarded to me documents from another medical evaluation and discharge of a patient at the Nevada County jail. This is for Mr. Chris Howie. Review of the deposition by Mr. Howie (Deposition of Chris Howie March 21, 2022, video and jail medical exhibits) reveals that Howie suffered an injury while in custody (Howie lifted off floor, shackled at feet and hands, unable to stand on right leg. (Video at 8:40 to 9:00); he requested medical evaluation and it was not performed.  On Mr. Howie's discharge from the jail, no arrangements were made for follow up medical evaluation. (P18:17 to 21:18, 22:4 to 23:14) The jail medical record (Exhibit 2) indicates Mr. Howie's complaints of pain, which were noted (Bates stamp page 10, questions 9 and 17) and his observed difficulty walking (Bates stamp page 12 question 12) as well as the notation that this was a new injury that had just occurred were recognized, but no action was taken. (Bates stamp page 10 questions 17 and 34) Indeed, there are no further notations regarding this condition in the jail medical record, including no indications of examination of the leg, no medical action to assess his inability to bear his own weight and no medical sick calls. (Bates stamp page 39)
Mr. Howie could not walk on discharge and no transportation or plans for such were arranged. Mr. Howie called a taxi who called 911 for ambulance transport to the hospital. (Deposition of CHRIS HOWIE March 21, 2022 P40:10 to P40:22) Mr. Howie was then admitted to Sierra Nevada Memorial Hospital (SNMH) for a fracture of his right tibia, which would require surgical repair. (Exhibit 3 SNMH records) and follow up was arranged.
The lack of medical care in Mr. Howie's case is very similar to that which was the case with Mr. Peterson. Complaints were not addressed. Evaluation was inadequate. Arrangements for follow up or further care were not performed.
The failure to make a transfer of care is in contrast to the detailed planning at the SNMH emergency department, which provide an example of fully appropriate transfer of care requirements (Exhibits 4 and 5)

III.     **Summation**

In summary, I do not believe that Dr. Ehrlich addressed the rapid development and progression of Mr. Peterson's abscess. Dr. Ehrlich did not address various factors that supported the acute development of the abscess and argued against an indolent process. It is not clear to me that he reviewed the medical records from the jail.

- I stand by my comments at the initial deposition that the procedure for discharge of an inmate from a medical perspective is not clear and was not clear to either Ms. Tirpack or Ms. Adams;
- It is clear that Wellpath medical personnel have the authority to direct medical care that is needed and have that authority over the jail personnel to direct such care;
- I find that the failure to arrange for further care for Mr. Peterson or to even instruct them to receive further care or even initiate treatment for his obviously rapidly progressing infection was not only medically negligent, below any community standard of care for any practitioner, and finally, ethically inappropriate and demonstrated an indifference to his clinical condition.
- I find that the medical care or lack thereof at the jail and the failure to arrange for a transfer of care or provide any reasonable means of transportation on discharge demonstrates indifference for the medical status of the inmate under their care and that required for those incarcerated.

I think it is also important to clarify my testimony and further opine about the absence of appropriate procedures at the Nevada County Jail for the transfer of medical care to an appropriate outside medical provider when an inmate is released from custody.  Based upon my review of all of the evidence provided to me to review (jail medical records, depositions, videos, etc.), there appear to be no adequate procedures on the part of both the Nevada County Sheriff's Office ("NCSD"), which operates the jail, and its contract medical services provider for the jail, Wellpath.  The absence of such appropriate procedures was, in my opinion, a direct contribution to the inadequate medical care and complications they incurred and the very inappropriate release of Mr. Peterson and Mr. Howie in January 2018.

Based upon my experience of medical practice which includes many years at large medical providers, I think that there should have been specific policies and procedures about the following:

- Unambiguous communication in writing between the NCSD and Wellpath regarding whether an inmate is medically fit to be released from custody and/or needs transport to the local ER or to another medical provider;
- Wellpath should be required to give inmates being released from custody a written medical plan or discharge instructions about existing serious medical conditions;
- Wellpath should arrange for transfer of medical care to a new medical provider in a timely and appropriate manner;
- The NCSD should provide transportation for inmates that are being released from custody, but who for medical reasons are unable to (or should not) ambulate on their own and/or are otherwise unable to obtain transport to a medical provider for further medical care.

Submitted, Electronically signed.		May 31, 2022

David J. Witt, MD, FIDSA, CIC